## PEOPLE v. GLENNON.

(Supreme Court, Appellate Division, First Department. January 16, 1903.)

1. POLICE OFFICERS—NEGLECT OF DUTY—FAILURE TO SUPPRESS HOUSE OF PROS-
TITUTION—EVIDENCE—SUFFICIENCY.

New York City Charter, § 315, declares it the duty of all members
of the police force to carefully inspect all houses of prostitution, and to
repress all disorderly conduct therein, etc.; and Pen. Code, § 117, makes
it a misdemeanor for a police officer to fail to perform the duty imposed
by the charter. In a prosecution of a police officer under these sections
for failure to suppress a house of prostitution of which he had knowledge,
evidence considered, and *held* sufficient to support a conviction.

2. SAME—CHARGE—ELEMENTS OF OFFENSE.

In a prosecution under New York City Charter, § 315, and Pen. Code,
§ 117, for failure of a police officer to suppress a house of prostitution
of which he had knowledge, a charge that it must be proven beyond
a reasonable doubt that the house was one of ill fame, to defendant's
knowledge, and that with such knowledge he willfully neglected to sup-
press it, was sufficiently favorable to defendant.

3. SAME—RIGHT TO ARREST—SOURCE OF INFORMATION.

In a prosecution under New York City Charter, § 315, and Pen. Code.
§ 117, for failure of a police officer to suppress a house of prostitution
of which it was alleged he had personal knowledge, the court properly
refused to charge that, though the defendant might have had the strong-
est moral certainty that the house was one of prostitution, yet if he did
not know of somebody who could swear, of his own knowledge, to the
facts of which defendant was morally certain, he had no right to make
an arrest, since, under Code Cr. Proc. § 177, a peace officer may arrest
any person whom he has reasonable ground to believe has committed
a crime.

4. SAME.

In a prosecution under New York City Charter, § 315, and Pen. Code,
§ 117, for failure of a police officer to suppress a house of prostitution of
which he had knowledge, defendant requested a charge that he would
not have been justified in making an arrest based upon no other evidence
than that of the reputation of the house as one of ill fame, nor upon
evidence insufficient in law to secure a conviction should he have made
such an arrest. An instruction was given that unless defendant had
evidence of the character of the house the prosecution must fail. *Held*
that, as defendant's duty was not limited to making arrests, the refusal
of the request was not error, in view of the instruction given.

5. SAME—REASONABLE DOUBT.

In a prosecution for misdemeanor, where the court charged that the
defendant is entitled to the presumption of innocence throughout the
case, until finally overborne by evidence which will satisfy the jury of
guilt, and that this presumption renders it unnecessary for defendant to
testify to his innocence, and to overthrow this presumption there must
be evidence of guilt short only of absolute certainty, the refusal of a
charge that "the presumption of innocence is legal proof or evidence"
was not error; the charges given on that subject being ample.

Appeal from court of general sessions, New York county.

Edward G. Glennon was convicted of willful neglect of duty as a
public officer, and appeals. Affirmed.

See 74 N. Y. Supp. 794.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGH-
LIN, O'BRIEN, and INGRAHAM, JJ.

Ira Leo Bamberger, for appellant.

Howard S. Gans, for the People.

INGRAHAM, J.   The defendant, a police officer of the city of New York, was indicted for willful neglect of duty in neglecting to carefully observe and inspect, and to use and exercise all proper, reasonable, and effective means within his power for the prevention of the keeping and maintenance of, a house of ill fame and a house of prostitution in the city of New York, and for the detection and arrest of the person keeping and maintaining the same.   The defendant was convicted, and upon this appeal relies upon exceptions taken to the charge of the court, to rulings upon refusals to charge, and to rulings upon questions of evidence.   The record is quite voluminous, and there are many objections and exceptions which are not insisted upon by counsel for the appellant, and which it will not be necessary to discuss.   We have carefully examined this whole record, however, and can find no exception that, in the view that we take of the case, would justify us in reversing the judgment.

The defendant was attached to the Nineteenth precinct as a patrolman detailed by his superior officers to duty in citizen's dress.   His special duty was to examine and report, under the direction of the captain of the precinct, upon disorderly houses and other like violations of law.   On or about the 31st day of May, 1901, the police department received a communication from an officer of the Society for the Prevention of Crime which stated that No. 148 West Thirty-Third street was a disorderly house; that it had been open for some time; that inmates thereof had accosted men from the stoop,—and requesting that the house be closed.   This communication appears to have been referred to the inspector of the district in which this precinct was situated, and was by the inspector referred to the captain of the precinct, with instructions to make a thorough and careful investigation of the matter, and to use all lawful means to remove the evil, if such evil was found to exist.   Within an hour or two after the captain received this notice, on June 7, 1901, he told the defendant, with the other officers who were attached to the precinct, and assigned to duty in citizen's dress, that he had received a complaint from the Society for the Prevention of Crime of the existence of a disorderly house at 148 West Thirty-Third street, and instructed the defendant and the other officers to investigate the complaint, and to use all proper means at their command to ascertain whether the house was as charged in the complaint.   Subsequently the defendant reported to the captain that he had been to the house, and had endeavored to obtain evidence, and had not obtained it; that he went there a number of times, and watched the house from the outside, to see if there was any evidence of a disorderly house, without discovering any, and had been there a number of times and tried to get in, but was refused admittance.   The defendant subsequently made like reports to the captain in relation to this house, and nothing was done by the defendant or the police of his precinct to suppress the house.   It would seem that the defendant was on duty from the 7th of June to the 9th of August, 1901, with the exception of two days.   On the 9th of August this house was raided, when its character was at once demonstrated, and arrests were made.   A witness who resided at No. 146 West

Thirty-Third street, next door to the house in question, was called by the prosecution, and testified that the house 148 West Thirty-Third street had been a disorderly house for three years; that from the 1st of January, 1901, to the time when the house was closed, in August, there was a woman on the stoop day and night; that she called to every man that passed by; that the witness had heard her invite men into the house; that she had invited the witness in; that there was hardly a time when the witness passed but that he had not been hissed at to come in; that they were dancing and singing in the house all night; that when the windows were open in the summer he could, in the adjoining house, hear constant singing and music coming from the house in question; that the women were in the habit of coming to the windows partially undressed; that he passed the house five or six times a day, and when on the step of his own house could see men going in and out by the dozens, and women on the stoop inviting them in; and that this was going on openly day and night. Another witness, who lived at 146 West Thirty-Third street, testified that she had observed this house from the 1st of January until the commencement of June, when she left; that she heard dancing, music, and carrying on all night; that there were women at the windows calling men in as they passed, and that there was a woman on the stoop day and night, calling men in; that women stood on the stoop day and night, soliciting and beckoning men to come in; and that she saw men go into the place constantly. Another witness, who resided in the same house, testified that she had observed this house, 148 West Thirty-Third street, for about a year before August 9th; that there were dancing, singing, and carrying on there until 4 o'clock in the morning, so that the witness could not sleep; that this went on nearly every night up to the time the house was closed; that the women at the windows and on the stoop were lightly dressed; and that this continued from the 1st of January to August, when the house was suppressed. Another woman, who had lived at the same house for one year, testified that she saw men constantly going into 148 West Thirty-Third street; that she saw girls sitting at the windows, calling the men in; that this was kept up day and night until 2 or 3 o'clock in the morning. Another woman, who resided at 146 West Thirty-Third street, testified that from the 1st of January, 1901, to August, 1901, she saw men being solicited from the windows and from the doors all hours in the day, and in the early hours in the morning, and at night; that she noticed a woman on the stoop, calling the men in, besides the women in the windows; that the witness had reported this house to the police, but could not specify the officer. An officer for the Society for the Prevention of Crime testified that he visited this house 148 West Thirty-Third street on the 11th of June at about half-past 11 at night, in company with another officer of the society; that they were admitted to the house by a woman, and taken into the parlor, where eight women were seated; that he was asked by one of the women to treat, which he did; that he and his companion were solicited by women in the house, and that there were several other men on the premises while they were there;

that between the 1st of January and the 1st of August he had passed through this street several times, and had noticed women sitting on the stoop, soliciting men to come in. And his testimony is corroborated by the other officer who accompanied him in the house. Another witness, connected with the same society, testified: That he had known the defendant about 10 years, and that during all that time he was a police officer. That in the latter part of May or June, 1901, he had a conversation with the defendant on the southwest corner of Thirtieth street and Sixth avenue. That the defendant stated to the witness that certain poolrooms were going to be opened, and that they would like to be protected from interference by the Society for the Prevention of Crime, and, if such a thing could be done, there would be good money in it. That the witness told the defendant that he would see what he could do. That some time in June he again saw the defendant. That at that interview the defendant said that the superintendent of the society had been to the station house with a complaint against 148 West Thirty-Third street; that it had been referred to headquarters, and they wanted an investigation made, and he would like to find out what the society people wanted done with it; that the place had run for about three years, and they would like to have it continue to run, if possible; that the woman ran a quiet place, and he did not like to interfere with her unless it was absolutely necessary. That the witness again saw the defendant a week or two weeks after. That at that time the witness told the defendant that Dillon, an officer of the society, had said that the society was not going to raid any disorderly house unless they had orders from the executive committee to do so, and he guessed it would be all right to run, to which the defendant said, "All right," and asked the witness to call at the station house and let them know if any raid was intended by the society. That he subsequently had another talk with the defendant, at which he said that he had received a message from Dillon that the society was going to raid the place. That subsequently, on the 7th day of August, in consequence of a telephone message, he saw the defendant, and that time the defendant gave the witness a $100 bill, and said that it was a present from No. 148 West Thirty-Third street. Dillon, who was an officer of the Society for the Prevention of Crime, testified that he visited this house 148 West Thirty-Third street several times between the 1st of January and August, when the house was raided; that women were soliciting from the house; that on August 9th the agents of the society entered the house, and arrested the keeper and took her to the station house. The superintendent of the society, who made the complaint to the police, testified that he had occasion to observe this house from the 1st of May down to the time it was closed, in August; that whenever he observed the house there was a woman on the stoop, calling to men as they passed; that at other times during the winter there were women tapping on the windows, calling the attention of the men, and asking them to come in; that the witness was in the house in April, and saw six or seven women in the parlor, with several men there; that men and women were

talking and drinking together, and that he heard women ask men to take them upstairs, and saying that the cost would be $2; that he went into the house on August 8th at 11:30 o'clock, when the house was raided and the proprietor arrested.

I have detailed at length this evidence to show the public character of the house, and what transpired from the windows and stoop opening upon the public street. That the officers of this society had no difficulty in obtaining entrance to the house, and that, entrance once obtained, its character was apparent, would seem to be, from this evidence, conclusively established. In fact, it would appear that the only persons who had any difficulty in obtaining complete knowledge of the character of this house were the police officers charged with the duty of observing and inspecting the house and suppressing it; and, if this testimony is true,—and certainly the jury had a right to credit it,—a slight observation by a police officer should necessarily have disclosed the character of the house, and furnished him with the evidence to justify him in applying for a warrant for the arrest of those engaged in maintaining and operating it. The defendant and several other police officers attached to this precinct testified as to their efforts to obtain evidence as to the character of this house, and that they were unable to succeed, and other persons who were in the habit of passing through this street testified that they had failed to observe any evidence that the house was of the character described.

The duty imposed by law upon this defendant is specified in section 315 of the charter of the city of New York. That section provides:

"It is hereby made the duty of the police department and force, at all times of the day and night, and the members of such force are hereby empowered, to carefully observe and inspect all houses of ill-fame or prostitution, and houses where common prostitutes resort or reside, and to repress and restrain all unlawful and disorderly conduct or practices therein; and to suppress and prevent the violation of all laws and to arrest all persons guilty of violating any law for the suppression or punishment of crime."

And it was a willful neglect in the performance of this duty by the defendant for which he was indicted, and of which he has been convicted. This duty imposed upon the defendant was not solely to arrest in case a violation of the law had been committed in his presence. There was specifically imposed upon him the duty to carefully observe and inspect all houses of ill fame or prostitution, and to repress and restrain all unlawful and disorderly conduct or practices therein, and to arrest all persons guilty of violating any law for the suppression or punishment of crime. Knowledge that a complaint had been made against this house was communicated to the defendant by his superior officer, and he received directions to inspect this house and to obtain evidence of its character if possible. In the face of the evidence offered by the prosecution, if that evidence is to be credited, it is perfectly clear that this officer either failed in his duty to observe and inspect this house, for the most casual inspection would have disclosed to him facts which would clearly have established the character of the house, or, having inspected and ascertained its character, he failed to report what he observed to his superior officer, and failed to perform the duty that then rested upon him, of obtaining a warrant for the arrest of the

keeper of the house, or of himself making an arrest. He was indicted both for failing to inspect and observe the house, and also for failing to suppress it or arrest the inmates; and, if the evidence of these witnesses called by the prosecution is to be believed, the conclusion irresistibly follows that the defendant willfully neglected his duty in one or the other of the particulars mentioned. If the testimony of Whitney is true, the motive of the defendant in thus neglecting his duty as a police officer is quite apparent. To sustain this conclusion it is not necessary to show that this defendant had personal knowledge of the character of the house, such as would justify him in arresting any one upon the premises, without a warrant, and failed to make an arrest. What he was bound to do was to observe and inspect the house, and to repress and restrain all unlawful conduct or practices therein. For a failure to perform either of these duties he was guilty of a misdemeanor, under section 117 of the Penal Code. If, instructed by his captain to inspect and observe this house and report upon its character, he failed to perform that duty, and made a false report to his captain, he would be guilty of a violation of this section of the Penal Code. If he inspected it and ascertained its character, as, from the evidence offered by the prosecution, he necessarily would have done, it was his duty to report the facts to the captain, and, if the evidence was not sufficient to justify him in arresting any particular individual, to obtain a warrant for the arrest of the person who was the owner or keeper of the house. He could have repressed or restrained the commission of illegal acts upon the premises by obtaining a warrant for the arrest of those keeping the house, when he had obtained knowledge of facts which would justify the inference that the house was a disorderly house, within the meaning of the statute; and, assuming that the witnesses for the prosecution testified truthfully to the occurrences there, it is impossible to believe that the defendant could have made any serious effort to obtain evidence as to the character of the house without the discovery of such facts as would justify him in applying for a warrant.

In submitting the case to the jury, the court, after reading to them the section of the charter to which attention has been called, and the section of the Penal Code under which the defendant was indicted, said:

"If any one of the three questions of fact which I will submit to you be not proven to your satisfaction, beyond a reasonable doubt, the defendant cannot be found guilty. If all three are proven to your satisfaction, beyond a reasonable doubt, he should be convicted of the charge against him."

These three questions were:

First, "Was the house No. 148 West Thirty-Third street a house of ill fame, resorted to or occupied by women for lewd purposes?" The second, "Did the defendant have knowledge of its character?" And, third, "Did he, with knowledge of its character, willfully neglect and omit to perform the duty enjoined upon him by law in reference to that house?"

The court thus imposed upon the prosecution the obligation of proving, beyond a reasonable doubt, that the defendant had knowledge of the character of this house, and, with knowledge of its character, willfully neglected and omitted to perform the duty enjoined upon him

by law with reference to it. This certainly was as favorable a view of the law as the defendant was entitled to. The court then, at the request of the defendant, charged:

"In order to obtain a warrant for the arrest of any person, the defendant must make an oath; in order to make an oath, he must know that what he swears to is true; and, in order to swear to it, he must have evidence, and without evidence the whole foundation of the prosecution fails,"—and that the omission or neglect, in order to be willful, within the meaning of the statute, must be with knowledge and with criminal intent.

There was no exception to the charge, and the only exceptions taken by the defendant were to the refusals to charge certain requests. The defendant relies upon exceptions to refusals to charge the sixth and ninth requests. The sixth request is:

"The defendant might have had the strongest moral certainty in the world that the house No. 148 West Thirty-Third street was a house of prostitution, yet if he did not know of somebody who can swear, of his own knowledge, to the facts of which the defendant was morally certain, the defendant had no right to make an arrest. Such an arrest would have been wanton, and an indefensible act of false imprisonment."

This the court refused, in the language requested.
The ninth request was:

"The defendant would not have been justified in making an arrest based upon no other evidence than that of the reputation of the house No. 148 West Thirty-Third street as a disorderly house, house of ill fame, or house of prostitution, nor upon evidence insufficient in law to secure a conviction, should he have made such an arrest."

This the court also refused to charge.

I do not think that, conceding the first request to have been pertinent, it contains a proper statement of the law. The defendant was a police officer, and as such had power to arrest a person guilty of a misdemeanor committed in his presence. If he had personal knowledge of the fact that this house was a house of prostitution, it was not only his right, but his duty, to arrest those maintaining the house. Yet this proposition eliminates this personal knowledge of the defendant. The court was asked to say that if the defendant did not know of somebody who could swear, of his own knowledge, to the facts of which the defendant was morally certain, the defendant had no right to make an arrest. By section 177 of the Code of Criminal Procedure it is provided that a peace officer may, without warrant, arrest a person for a crime committed or attempted in his presence; when the person arrested has committed a felony, although not in his presence; when a felony has in fact been committed, and he has reasonable cause for believing the person to be arrested to have committed it. If this was a disorderly house, and the defendant had personal knowledge of that fact, it was his duty to arrest the person maintaining it, whether he knew of anybody else who could swear to the facts or not. This whole case was tried upon the theory that the defendant did have knowledge of the fact that a crime had been committed, and, having such knowledge, willfully refused to make an arrest or suppress the house as required by law; and it would have been misleading to charge that he was not justified in making an arrest unless he had the evidence of some other person as to the facts to justify the inference that

a crime had been committed. But this request to charge was refused, in the language proposed; and the court had already charged the jury that, to convict the defendant, they must find that the defendant had knowledge of the character of this house. There was evidence that would justify the jury in finding that this defendant had personal knowledge of the character of the house, and took an active part in endeavoring to prevent it from being interfered with.

I also think the court was justified in refusing to charge the ninth request. The duty of the defendant was not, under the law, limited to making an arrest; and the court had instructed the jury that, unless the defendant had evidence of the character of the house, "the whole foundation of the prosecution fails." The refusal to charge these requests was not an instruction to the jury that the officer had power to arrest any one in this house without personal knowledge that an offense had been committed, or without having obtained a warrant from a magistrate; and the jury had been correctly instructed upon the duty of the ·defendant, and what the jury must find to justify a conviction, and, in view of the charge as given, we do not think the refusal to charge this request was error.

The next exception relied upon by the defendant is the refusal to charge that "this presumption of innocence is legal proof or evidence." Upon that subject the court charged the jury:

"The defendant is entitled to the presumption of innocence, and that presumption rests with him throughout the case, and until it be finally overborne by evidence which will satisfy the jury of the guilt of the defendant, and then the presumption is overthrown."

And then, at the request of the defendant, the jury were instructed that:

"This presumption or proof of innocence created by law renders it unnecessary for the defendant to testify as a witness to his innocence;" and "to overthrow this presumption of innocence there must be legal evidence of guilt, carrying home to the mind of every juror a degree of conviction short only of absolute certainty."

This certainly presented a question of presumption of innocence more strongly than was justified, and the refusal to say that the presumption is legal proof or evidence was not error.

There are many exceptions to rulings upon evidence which are presented in the record, but I do not find that any of them would justify a reversal of this judgment. Upon the whole case, I think the defendant has had a fair trial, that there is no doubt of his guilt, and that the jury were justified in the conclusion at which they arrived.

The judgment appealed from should be affirmed. All concur.